471 F.2d 582
 5 Fair Empl.Prac.Cas. 308, 5 Empl. Prac. Dec. P 8090
 UNITED STATES of America, Appellant,
v.
The CHESAPEAKE AND OHIO RAILWAY COMPANY, a corporation, et
al., Appellees.
UNITED STATES of America, Appellee,
v.
LOCALS 268 AND 1130 OF the BROTHERHOOD OF RAILROAD TRAINMEN,
Appellants.
 
 Nos. 72-1297, 72-1298.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 4, 1972.
Decided Dec. 26, 1972.
Certiorari Denied April 16, 1973.
See 93 S.Ct. 1893.
 David W. Allen, Atty., Dept. of Justice (Brian P. Gettings, U. S. Atty. E. D. Va., David L. Norman, Asst. Atty. Gen. of the United States, and Robert T. Moore and Richard S. Weil, Attys., Dept. of Justice, on brief), for the United States.
 Joseph B. Geyer, Gen. Atty., Baltimore, Md. (Granger West, Newport News, Va., on brief), for The Chesapeake and Ohio Railway Co.
 James L. Highsaw, Jr., Washington, D. C. (Highsaw & Mahoney, Washington, D. C., and William J. Donlon, Gen. Counsel, Rosemont, Ill., McGuire, Woods & Battle and William H. King, Richmond, Va., on brief), for Locals 362 and 1796 of The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees.
 Willard J. Moody, Portsmouth, Va. (Raymond H. Strople, Moody, McMurran & Miller, Portsmouth, Va., and Robert D. Hart, Gen. Counsel, Cleveland, Ohio, United Transportation Union, on brief), for Locals 268 and 1130 of The Brotherhood of Railroad Trainmen.
 Before BOREMAN, Senior Circuit Judge, and WINTER and BUTZNER, Circuit Judges.
 BUTZNER, Circuit Judge:
 
 
 1
 The United States brought this action under Title VII of the Civil Rights Act of 1964[1] against the Chesapeake and Ohio Railway Company, Locals 268 and 1130 of the Brotherhood of Railroad Trainmen (now Locals 1307 and 1917 of the United Transportation Union), and Locals 362 and 1796 (now Lodge 349) of the Brotherhood of Railway, Airline and Steamship Clerks, Freight Handlers, Express and Station Employees.[2] The government alleged that the company and the unions engaged in discriminatory employment practices at the C&O's Newport News terminal, and that their collective bargaining agreements and the unions' segregated membership policies tended to perpetuate the effects of this discrimination.
 
 
 2
 The district court found no post-Act discriminatory hiring by the C&O. It ordered:
 
 
 3
 p the merger of two racially segregated BRAC clerks' locals;
 
 
 4
 p the merger of two racially segregated BRT brakemen's locals;
 
 
 5
 p the discontinuance of specified C&O employment qualification tests because they were not a measure of job performance;
 
 
 6
 p retention of jurisdiction for five years and the submission of compliance reports at stated intervals.
 
 
 7
 No party has appealed from these provisions of the decree.
 
 
 8
 The district court also found that the C&O had not engaged in pre-Act discrimination, and that it maintained bona fide seniority systems. Nevertheless, the court granted relief to facilitate progression of some employees to higher job classifications and to eliminate certain abrasive features of the seniority systems at the terminal. From these provisions of the decree, the government appeals, claiming that the evidence discloses pre-Act racial discrimination and asking for further relief to eliminate the unnecessary present effects of past discrimination. Specifically, the government contends that current seniority rosters and transfer policies, while racially neutral, perpetuate the effects of past discrimination by confining black employees to inferior, traditionally black jobs. The BRT locals cross-appeal from a provision of the court's decree that directs the utilization of company seniority to establish rank on the general yard conductor's roster.
 
 
 9
 In considering these appeals, we have the benefit of two cases-published after the opinion of the district court had been filed-that deal with racial discrimination in railway employment.[3] Guided largely by these cases and other recent precedents, we grant substantially the relief which the government seeks and deny the BRT locals' cross-appeal.
 
 
 10
 Because the C&O has hired black brakemen and black clerks without discrimination since the effective date of the Act, the remedies that we order concern only black employees who were hired under the company's pre-Act employment policies. Parts I, II, and III of this opinion deal with the brakemen, conductors, and clerks, respectively, and Part IV considers the issue of "crosscraft" relief.
 
 
 11
 * Brakemen work in one of two places, the general yard[4] or the Barney yard. All general yard employees, which include brakemen and conductors, are members of BRT (white) Local 268; all Barney yard brakemen are members of BRT (black) Local 1130.
 
 
 12
 Before 1914, an all-black work force employed by an independent contractor loaded export coal on ships. In that year, after constructing a coal pier which is now a part of the Barney yard, the C&O hired the contractor's employees. Thus, the Barney yard was all-black from its inception. The general yard at that time was racially mixed, but it later became exclusively white.
 
 
 13
 In 1918 the Barney yard brakemen, through their yard committee, entered into an agreement with the C&O,[5] which provided that Barney yard riders will be "classed and paid as yard brakemen," and that "seniority rights of the men on the Barney yard and on the general yard will be separate and distinct." Although this agreement made no mention of race and was designed to equalize the pay of brakemen, it was regarded by the C&O and its employees as a segregation agreement. Until 1957, when the company suspended hiring, white brakemen were hired only at the general yard and black brakemen only at the Barney yard. The racially identifiable pattern that emerged is illustrated by the seniority rosters for each yard. Prior to January 1, 1970, when the company resumed hiring brakemen, the 193 employees on the general yard were white, and the 164 Barney yard brakemen were black.
 
 
 14
 Opportunities for promotion are greater in the general yard than in the Barney yard. General yard brakemen can advance to yard conductor, assistant yardmaster, yardmaster, and management positions. None of those jobs are open to Barney yard brakemen. The senior Barney yard brakemen on each shift may operate the car retarder, a job which pays more than a brakeman's on either yard, and the senior man on each crew acts as foreman. There are no other avenues of advancement. Supervisors of the Barney yard are white.
 
 
 15
 Brakemen in both yards are paid on the same scale, although some Barney yard brakemen near the top of their seniority roster make larger annual salaries than general yard brakemen. Nevertheless, the average gross earnings of Barney yard brakemen are 20 per cent less than those of general yard brakemen because work is more irregular in the Barney yard than in the general yard.[6]
 
 
 16
 The company and the unions challenge the government's allegation that the C&O formerly discriminated on the basis of race. They argue that the government has failed to prove any overt act, agreement, or policy by the C&O in hiring and assigning new brakemen, that the government has failed to establish any "pattern or practice" of discrimination, and that mere statistical evidence of segregation does not establish discrimination. These arguments fail to perceive the impact of recent cases which hold that statistical evidence is sufficient to establish at least a prima facie case of discrimination in Title VII litigation.[7] Since the employment statistics demonstrated that pre-Act hiring racially segregated both the general yard and the Barney yard, the burden shifted to the C&O to come forward with evidence to show that it had never discriminated in hiring black brakemen.[8]
 
 
 17
 The company, however, has failed to refute the government's prima facie case. Indeed, the C&O's answers to interrogatories proved that from 1918 until the effective date of the Act the company hired only white men at the general yard. The participation of the black brakemen through their yard committee and union in establishing the company's hiring policy and the acquiescence of the government in the segregation of the yards did not make the discrimination any less real.[9] Moreover, evidence that the company practiced decentralized hiring for the yards and that vacancies were filled by referral from incumbents are indicia of discrimination that sustain rather than disprove the government's charge.[10]
 
 
 18
 We conclude, therefore, that the C&O's pre-Act hiring practices discriminated against black brakemen. Standing alone, however, pre-Act discrimination is insufficient to maintain a cause of action under Title VII; to be actionable, the proof must show present effects of the past discrimination.[11] The present mechanism of discrimination, the government asserts, is the company's practice, embedded in its collective bargaining agreements, of denying black Barney yard brakemen who were employed before the company reformed its hiring policies their company seniority should they seek employment in the general yard.
 
 
 19
 The evidence disclosed that the company maintains separate seniority rosters for each yard and that its collective bargaining agreements with the BRT prevent men in one yard from bidding on jobs in the other. The present effects of pre-Act discrimination are readily discernable. The Barney yard brakeman who was initially denied employment in the general yard because of his race cannot now take advantage of the more favorable working conditions in the general yard without forfeiting his company seniority. Because of the critical importance of seniority, a Barney yard brakeman is thus frozen or locked into a less desirable job than his white counterpart who was hired at the same time in the general yard.
 
 
 20
 The C&O and the union seek to justify their present regulations on two grounds. They contend first that the yard or departmental seniority system is validated by Section 703(h) of the Act.[12] The courts of appeals dealing with the subject have rejected similar arguments and held that seniority systems which perpetuate past racial discrimination violate the Act.[13] Two recent cases have applied this principle to railroad employment substantially similar to the C&O's.[14]
 
 
 21
 The company and the union next assert that business necessity justifies forbidding Barney yard brakemen from transferring to the general yard while retaining their company seniority. The test of business necessity, we recently held, "is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business."[15] Measured by this standard, we find no merit in the defense of business necessity.
 
 
 22
 The record does not demonstrate that black brakemen are incapable of working in the general yard. Indeed, some Barney yard brakemen have worked there satisfactorily on an emergency basis in the past. In both yards the men perform many similar tasks. In addition, general yard brakemen must know how to control trains by signals, and be familiar with rules and regulations governing the movement and switching of trains in and out of the yard and on the road. Despite these requirements, a brakeman's job in the general yard is an entry level position, which the employee learns as he works. The most junior Barney yard brakeman eligible to transfer to the general yard was employed before 1958. There is no proof that a brakeman with fourteen years' Barney yard experience cannot qualify as readily in the general yard as an inexperienced man hired off the street. When a Barney yard brakeman has qualified to fill a vacancy in the general yard, no reason founded on business necessity is disclosed by the evidence for denying him to his company seniority.
 
 
 23
 To remedy the disadvantages suffered by the Barney yard brakemen the court decreed the merger of the seniority roster of both yards on a "top and bottom" basis. All Barney yard brakemen were placed at the bottom of the general yard seniority roster in the order of their rank on the Barney yard roster. Similarly, all general yard brakemen were placed at the bottom of the Barney yard roster in the order of their rank on the general yard roster. All brakemen were allowed to bid on jobs in either yard. The relief granted by the district court is paradoxically unnecessarily broad and unduly restrictive. It is too broad because it allows general yard brakemen to bid on Barney yard jobs and it permits Barney yard brakemen who were hired after the effective date of the Act to bid on general yard jobs. Neither of these classes of employees were the victims of discrimination, and the relief ordered by the district court need not embrace them.[16] The government does not request and nothing in the Act commands such a drastic overhaul of the C&O's departmental and seniority structure. At the same time the decree is too restrictive because it does not allow Barney yard brakemen hired before the Act the benefit of their company seniority when they transfer to jobs that were previously denied them because of their race. They are still relegated to a position inferior to white employees who were hired after them. It was precisely this type of restriction that was condemned by the Court of Appeals for the Eighth Circuit when it held that black train porters who suffered pre-Act discrimination should have the benefit of company seniority when they transferred to vacancies on the brakemen's roster.[17]
 
 
 24
 Accordingly, on remand the district court should enter a decree that will enable qualified Barney yard brakemen who were employed before the effective date of the Act to exercise their company seniority with respect to: (a) filling general yard vacancies, including those caused by furloughs, and (b) thereafter enjoying all other prerogatives dependent on seniority. Of course, the company and the union may agree to a broader merger of the seniority rosters or to eradicate other distinctions between the yards, provided that the company seniority of the Barney yard brakemen hired before the Act is fully recognized.
 
 II
 
 25
 Yard conductors receive more pay than brakemen, but the position has been open only to white employees because the C&O selected its conductors from the general yard. A black brakeman hired before the effective date of the Act, regardless of his education or ability, was not eligible for promotion to conductor. To correct this violation, the district court set forth a three-step procedure for Barney yard brakemen to qualify for the position: (1) two years experience in the Barney yard; (2) a minimum of 80 hours on-the-job training in the general yard, unless the company determines they are qualified without such training; (3) passing the yard conductor's examination. The decree provided, however, that Barney yard brakemen would establish seniority on the yard conductors' roster on the day they passed the examination, and their company seniority date would be considered only if both a general yard brakeman and a Barney yard brakeman pass the examination the same day. No party complains about the three qualifications the district court required. However, the BRT appeals the tie-breaking provision concerning seniority, asserting that a yard brakeman should always prevail on the basis of his general yard experience. The government proposes that all Barney yard brakemen should establish yard conductor seniority as of their company seniority date.
 
 
 26
 The most junior Barney yard brakeman who was employed before the C&O reformed its hiring policies already has approximately fourteen years experience as a brakeman. There is no proof in the record that a Barney yard brakeman with at least this much seniority who has passed the C&O conductor's examination and undergone the 80 hours training required by the district court is not as well qualified as a white brakeman with less company seniority. Since Barney yard brakemen were ineligible for promotion to conductor until the court entered its decree, ranking them on the conductors' roster by the date of examination simply perpetuates the racial discrimination that initially barred them from becoming conductors. Only when the Barney yard brakemen can assert their company seniority for all purposes will present effects of past discrimination be fully eradicated.
 
 
 27
 White general yard brakemen are currently ranked on the seniority roster by the date they pass the conductor's examination. Therefore, if only the black Barney yard brakemen are ranked by company seniority, in certain instances they could achieve super-seniority to which they are not entitled under the Act.[18] To avoid super-seniority, the government suggests that all brakemen on the conductors' roster, regardless of race, be ranked by their company seniority. But this remedy is unnecessarily sweeping, for if all brakemen are ranked by company seniority on the conductors' roster, certain general yard brakemen may be displaced by other general yard brakemen with more company but less conductor seniority.
 
 
 28
 Accordingly, on remand the district court should modify its decree to provide that as between a Barney yard brakeman and a general yard brakeman or between two Barney yard brakemen competing for a conductor's job, company seniority shall determine rank; and as between two general yard brakemen, the present conductors' roster rank may be retained. The C&O and the union may, of course, agree to dovetail the conductors' roster on the basis of company seniority or to modify it in any other nondiscriminatory way that does not diminish the full use of company seniority by the black Barney yard brakemen who were hired before the Act.
 
 III
 
 29
 When the government filed its complaint in 1968, the C&O's clerical craft employees, who are represented by the Brotherhood of Railway and Airline Clerks (BRAC), were divided into three groups. The C&O maintained separate seniority rosters for each group, and an employee's rank determined the preference that he enjoyed in bidding for jobs. Transfer from one group to another, while contractually possible, was severely restricted. The evidence also established that before the effective date of Title VII, black employees were relegated to less desirable positions as laborers. This combination of discriminatory pre-Act hiring and current restrictive transfer policies depicts a present pattern of discrimination.[19] As late as 1970, the three groups of clerical craft employees were racially identifiable. Group 1, composed of office, clerical, and supervisory personnel, consisted of 214 white and 2 black employees. Group 2, the messengers, guards, and telephone operators, was composed of 87 white and 2 black employees. In contrast, of 162 Group 3 laborers, 158 were black. The C&O has not rebutted the prima facie case proved by these statistics. Although the black laborers in Group 3 have had a contractual right to bid on Group 1 or 2 jobs since 1936, attempts to advance to these positions were rebuffed by the company, and no black employee established Group 1 or 2 seniority until 1966. By the time the case was tried in 1971, only 10 Group 3 employees had established seniority in the other groups.
 
 
 30
 The union's racial policies reflected the company's. The local lodges of BRAC were virtually segregated. Group 1 and 2 employees belonged to BRAC Local 362. Some Group 1 and 2 employees and all Group 3 employees belonged to BRAC Local 1796.
 
 
 31
 The district court, recognizing the discrimination against black Group 3 laborers, ordered that they be allowed to bid for Group 1 and 2 vacancies on the basis of their company seniority until the collective bargaining agreement merged the rosters. It also ordered merger of the segregated BRAC locals.
 
 
 32
 Pending appeal, BRAC and the C&O, along with 167 other Class I railroads, amended their collective bargaining agreements to settle a jurisdictional dispute between the clerks' union and the telegraphers' union over railroad communications work. To implement this agreement, BRAC and the C&O merged the separate group seniority rosters and relaxed the rules for bidding on future vacancies to the extent that the government stipulates that the agreement provides "all the intra-craft relief sought for Group 3 employees at the Newport News terminal." The government does, however, assert that since the company and the union are free to return to their former discriminatory practices, injunctive relief is proper. The company and the union urge that the controversy concerning the clerical crafts is now moot, and that no injunctive relief is warranted.
 
 
 33
 The C&O and the union have failed to show that "subsequent events [have] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,"[20] and, therefore, this aspect of the case is not moot. In addition, the following factors persuade us that the government's request for injunctive relief should be granted. The modification of the collective bargaining agreement was not made to correct the discrimination against the black Group 3 laborers. Rather, the benefit they received was simply a collateral result of the settlement of a jurisdictional dispute between the clerks and the telegraphers. Both the C&O and the union have consistently asserted that their virtual segregation of black laborers into low paying jobs and a separate local did not violate the Act, although both the evidence and the law warrant a contrary conclusion. Moreover, the C&O still persists, as evidenced by its current terms of employment for the Barney yard brakemen, in perpetuating the effects of past discrimination. In view of these factors, we believe that the government has carried its burden of showing that "there exists some cognizable danger of recurrent violation."[21] Therefore, on remand the court should grant the government's motion for injunctive relief paralleling the amendment to BRAC's collective bargaining agreement.
 
 IV
 
 34
 The government also seeks limited cross-craft relief.[22] It asks that black Barney yard brakeman be allowed to bid on vacancies in the clerical craft, that black Group 3 employees be allowed to bid on brakeman's vacancies, and that both be authorized to use their company seniority for all purposes in their new job. The issues posed by the government's request have been considered by two other courts of appeals, which in well reasoned opinions allowed crosscraft relief.[23]
 
 
 35
 At the outset it must be recognized that the relief which the government seeks will require the modification of some of the provisions of the collective bargaining agreements of both the brakemen and the clerks. The company and the unions, resisting any change in these agreements, emphasize that the craft system, upon which the agreements are based, originated in General Order No. 27, promulgated by the Director General of Railroads during World War I. The genesis of the C&O's craft and seniority policies does not, however, exempt its current bargaining agreements from the Act. Speaking of the same Order, Judge Dyer wrote in Jacksonville Terminal:
 
 
 36
 These labor representatives fail to perceive that their pre-Act discriminatory policies, practices, and "understandings" -whether formal or informal -have compromised the racially neutral integrity of that venerable Order and its interpretative supplements. . . . At the Terminal today, blacks continue to experience the effects of pragmatic injustice; certainly this situation contravenes the avowed purpose of the Order and the Railway Labor Act. . . .
 
 
 37
 That hoary collective bargaining agreements now mandate perpetuation of past aberrations from the governmental policy does not affect the propriety of judicial action.[24]
 
 
 38
 And in a similar vein, Judge Ross wrote in the St. Louis-San Francisco Railway Company case:
 
 
 39
 It is true that Frisco could not have permitted a transfer of train porter seniority to the brakemen's roster without breaching its agreement with [the United Transportation Union], but "[t]he rights assured by Title VII are not rights which can be bargained away-either by a union, by an employer, or by both acting in concert. Title VII requires that both union and employer represent and protect the best interests of minority employees." Robinson v. Lorillard Corp. . . . The UTU is not immune from the duties imposed by Title VII; it is a party to this action, and it will have to accommodate itself to revisions in its contracts and its rules and regulations which may be necessary to assure compliance with the Act.[25]
 
 
 40
 We agree with the Jacksonville Terminal and Frisco courts that neither General Order No. 27 nor current collective bargaining agreements bar application of the Act.
 
 
 41
 The unions counter with the argument that in Jacksonville Terminal and Frisco the national labor organizations, which are the collective bargaining agents of the employees, were parties to the suits. Here the court declined to join the national unions. Their absence is of no moment. The locals, as agents of the national organizations, are before the court, and they adequately represent the unions' interests. This was demonstrated by the prompt compliance of the general chairman of the United Transportation Union with the decree of the court changing the seniority rosters of the brakemen in the general and Barney yards. We anticipate that the absence of the national labor organizations will present no obstacle to the district court's order, but if it becomes necessary to add new parties to execute the decree, the district court has ample authority to do so.[26]
 
 
 42
 The C&O and the unions urge that the present system of crafts and seniority is necessary to efficiently perform the company's business. A good deal of their argument is based on a misapprehension of Title VII and the remedies appropriate to enforce it. The defendants envision havoc if all 24,000 of the C&O's employees are entitled to use company seniority to bid for vacancies across craft lines. The short answer to their fears is that the law does not command this result. Title VII does not require either the company or the unions to forego the benefits afforded management and employees by nondiscriminatory craft, departmental, and seniority systems.[27] Application of the Act normally involves two steps. First, identification of the employees who are victims of discrimination, and second, prescription of a remedy to correct the violation disclosed by the first step. The Act does not require the application of the remedy to employees who are not subject to discrimination.[28] The government concedes that the C&O reformed its hiring policies by the time the Act became effective. Therefore, we are concerned only with those black employees who were hired before the Act and who, because of restrictive transfer policies, are presently unable, without forfeiting their company seniority, to move to jobs previously denied them. Specifically, since this case involves two crafts, a remedy need be fashioned only for the black Barney yard brakemen and the black Group 3 laborers who were employed before the C&O ceased its discriminatory hiring policies.
 
 
 43
 The company and the union contend that many of the black employees are not competent to fill jobs as brakemen or in Groups 1 and 2 of the clerical craft. This may well be true, and the Act does not require the company to employ or transfer a person who is not capable of doing the job for which he applies. But the Act does require the company to assess an employee's ability without regard to his race using only job related criteria.[29] A brakeman's job is an entry level position, and there are many entry level positions in Groups 1 and 2. These jobs can be as efficiently performed by qualified transferees as by new employees. Moreover, some black employees who have the advantage of long experience in the railroad industry may be able to fill non-entry level jobs with little or no additional training. Measuring their qualifications for these positions is not an impossible task. Business necessity does not dictate that a qualified employee must forfeit his company seniority when he transfers to a position which previously was denied him because of his race.[30] Resolving this issue in Jacksonville Terminal, Judge Dyer wrote, "We hold that continued use of the craft and class seniority systems to restrict the transfer and promotion opportunities of incumbent black employees at the Terminal is neither bona fide nor a business necessity: such systems necessarily exclude blacks from jobs for which they might otherwise qualify."[31]
 
 
 44
 In sum, we find no bar to cross-craft relief in the origins of the craft and departmental seniority systems, in the current collective bargaining agreements, or in the doctrine of business necessity. Accordingly, on remand the district court should enter a decree that will enable black Barney yard brakemen and black Group 3 employees who were hired before the effective date of the Act to bid across craft lines for brakemen and clerical vacancies for which they are qualified, carrying with them their company seniority.
 
 
 45
 The judgment of the district court is vacated in part and the case is remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Section 703(a) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-2(a), provides:
 It shall be an unlawful employment practice for an employer
 (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
 (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.
 Section 707(a), 42 U.S.C. Sec. 2000e-6(a) provides for civil actions by the Attorney General:
 Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action in the appropriate district court of the United States by filing with it a complaint (1) signed by him (or in his absence the Acting Attorney General), (2) setting forth facts pertaining to such pattern or practice, and (3) requesting such relief, including an application for a permanent or temporary injunction, restraining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights herein described.
 
 
 [2]
 In this opinion, we will refer to the Railway Company as the C&O or the company, and to the Brotherhood of Railway, Airline, and Steamship Clerks, etc., as BRAC. Although the Brotherhood of Railroad Trainmen is now merged into the United Transportation Union, the locals have been designated throughout this litigation as BRT locals and we will continue this nomenclature
 
 
 [3]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972)
 
 
 [4]
 We have adopted the terminology of the parties and use the phrase "general yard" to refer to the general yard and the classification yard
 
 
 [5]
 At the time the agreement was signed the company was under the control of the government as a result of the December 26, 1917 proclamation which established the United States Railroad Administration
 
 
 [6]
 Between January 1, 1960 and December 31, 1969, all Barney yard crews were cancelled 189 times, and fewer than 15 Barney yard brakemen worked on 319 other occasions. During the same decade, the number of general yard brakemen fell below 15 only once, and all general yard crews were never cancelled
 
 
 [7]
 See, e. g., United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 307 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (4th Cir. 1972); United States v. Hayes Int'l Corp., 456 F.2d 112, 120 (5th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544, 550 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971)
 
 
 [8]
 United States v. Hayes Int'l Corp., 456 F.2d 112, 120 (5th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544, 550 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Cypress v. Newport News Gen. and Nonsectarian Hosp. Ass'n, 375 F.2d 648, 654 (4th Cir. 1967); Chambers v. Hendersonville City Bd. of Educ., 364 F.2d 189, 192 (4th Cir. 1966)
 
 
 [9]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 309 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); United States v. Jacksonville Terminal Co., 451 F.2d 418, 454 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L. Ed.2d 655 (1971)
 
 
 [10]
 Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1383 (4th Cir. 1972); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); cf. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971)
 
 
 [11]
 Robinson v. Lorillard Corp., 444 F.2d 791, 795 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971)
 
 
 [12]
 Section 703(h), 42 U.S.C. Sec. 2000e-2(h), provides in part:
 Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority or merit system, or a system which measures earnings by quantity or quality of production or to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . ..
 
 
 [13]
 United States v. Bethlehem Steel Corp., 446 F.2d 652, 658 (2nd Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 796 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Local 189, Papermakers & Paperworkers v. United States, 416 F.2d 980, 988 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970); United States v. Sheet Metal Workers Local 36, 416 F.2d 123, 133 n. 20 (8th Cir. 1969); United States v. Hayes Int'l Corp., 415 F.2d 1038, 1044 (5th Cir. 1969); cf. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 248 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971)
 
 
 [14]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 307 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); United States v. Jacksonville Terminal Co., 451 F.2d 418, 448 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972)
 
 
 [15]
 Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971). Accord, Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); Rowe v. General Motors Corp., 457 F.2d 348, 354 (5th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 418, 451 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Bethlehem Steel Corp., 446 F. 2d 652, 662 (2nd Cir. 1971); Jones v. Lee Way Motor Freight, Inc., 431 F. 2d 245, 249 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980, 989 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)
 
 
 [16]
 See United States v. Bethlehem Steel Corp., 446 F.2d 652, 665 (2nd Cir. 1971)
 
 
 [17]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 308 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); accord, United States v. Jacksonville Terminal Co., 451 F.2d 418, 458 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L. Ed.2d 815 (1972)
 
 
 [18]
 See United States v. Bethlehem Steel Corp., 446 F.2d 652, 661 (2nd Cir. 1971); Quarles v. Phillip Morris, Inc., 279 F. Supp. 505, 519 (E.D.Va.1968)
 
 
 [19]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 307 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); United States v. Hayes Int'l Corp., 456 F.2d 112, 117 (5th Cir. 1972); United States v. Jacksonville Terminal Co., 451 F.2d 419, 448 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972); United States v. Bethlehem Steel Corp., 446 F.2d 652, 658 (2nd Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 795 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed. 2d 655 (1971); United States v. Ironworkers Local 86, 443 F.2d 544, 552 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 248 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); Local 189, Papermakers & Paperworkers v. United States, 416 F.2d 980, 988 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970)
 
 
 [20]
 United States v. Concentrated Phosphate Export Ass'n, Inc., 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968)
 
 
 [21]
 United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303 (1953). Accord, Rowe v. General Motors Corp., 457 F.2d 348, 359 (5th Cir. 1972); Parham v. Southwestern Bell Telephone Co., 433 F.2d 421, 426 (8th Cir. 1970); Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 657 (4th Cir. 1967)
 
 
 [22]
 The government sought cross-craft relief against 15 other unions, but the district court denied the government's motion to join these unions because it was untimely. The government has not appealed this issue. Instead, it limits its request for cross-craft relief to the two crafts represented by unions whose locals are parties to the suit-the brakemen and the clerks. The district court criticized as untimely the request for cross-craft relief involving these two crafts, but it nevertheless dealt with the question on its merits
 
 
 [23]
 United States v. St. Louis-San Francisco Ry., 464 F.2d 301 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L. Ed.2d 700 (1973); United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971), cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972)
 Cross-craft relief has also been allowed in the trucking industry, United States v. Central Motor Lines, Inc., 338 F.Supp. 532 (W.D.N.C.1971); cf. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (8th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971).
 
 
 [24]
 451 F.2d at 454
 
 
 [25]
 464 F.2d at 309
 
 
 [26]
 Griffin v. County School Bd., 377 U.S. 218, 234, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964)
 
 
 [27]
 Quarles v. Phillip Morris, Inc., 279 F. Supp. 505, 519 (E.D.Va.1968)
 
 
 [28]
 See United States v. Bethlehem Steel Corp., 446 F.2d 652, 665 (2nd Cir. 1971)
 
 
 [29]
 Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)
 
 
 [30]
 United States v. Bethlehem Steel Corp., 446 F.2d 652, 662 (2nd Cir. 1971); Robinson v. Lorillard Corp., 444 F.2d 791, 799 (4th Cir.), cert. denied, 404 U.S. 1006, 92 S.Ct. 573, 30 L.Ed.2d 655 (1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 250 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L. Ed.2d 237 (1971); Local 189, United Papermakers & Paperworkers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100 (1970)
 
 
 [31]
 451 F.2d at 453. Accord, United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 309 (8th Cir. 1972), cert. denied, 409 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973)