**BOROUGH OF ECONOMY, Petitioner,**

v.

**PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs March 3, 1995.

Decided June 1, 1995.

David G. Joyce, for petitioner.

Katherine H. Fein, Asst. Chief Counsel, for respondent.

Before COLINS, President Judge, and NEWMAN, J., and SILVESTRI, Senior Judge.

SILVESTRI, Senior Judge.

The Borough of Economy (Economy) petitions for review of an order of the Pennsylvania Human Relations Commission (PHRC) which determined that Economy discriminated against Nathaniel J. Moore (Complainant) on the basis of race (black) by

refusing to award him [1] a contract for refuse and garbage pick-up in the borough and directed Economy to pay damages to Complainant in the amount of $90,938.10 plus interest, representing Complainant's monetary loss from denial of the contract, and also directed Economy to award Complainant the refuse and garbage pick-up contract for the year 1995–1996.

The detailed factual and procedural history, necessary for a determination on the merits of this discrimination case, is as follows. Economy is a municipal corporation located in Beaver County, Pennsylvania. In the spring of 1986, Economy published an advertisement in the Beaver County Times newspaper soliciting bids for the exclusive right to provide residential garbage and refuse pickup in the borough.[2] The advertisement indicated that bids must be in the hands of the borough secretary prior to council's regularly scheduled meeting on May 13, 1986 and advised that specifications for the bid proposals were contained in the "SANITATION AND REFUSE DISPOSAL ORDINANCE" (Ordinance). See Joint Exhibit 3.

Economy's "SPECIFICATIONS FOR GARBAGE AND RUBBISH COLLECTION" (Specifications) identified further requirements. Specifically, the Specifications required, *inter alia*, a "[p]erformance bond in the amount of $25,000.00 *or security acceptable to Council* for contract period upon awarding of bid" and "[a]lternative bids for one-year contract and two-year contract."

See Complainant's Exhibit 2. (Emphasis added).

On May 13, 1986, in response to Economy's advertisement soliciting bids, Complainant submitted a bid [3] for Complainant to provide yearly residential refuse and garbage pick-up services for the time period of 1986–1988. Two other bids were also submitted: one by Elliot Reid Powell for a one-year period at the rate of $14.25 per quarter per household,[4] and the other by Gary E. Robinson at the rate of $3.95 per month for two (2) 32 gallon bags and one large item per week and $4.95 per month for four (4) 32 gallon bags plus one large item per week. The three garbage and refuse bids were referred to committee for review; the award of the contract was to be made on May 28, 1986.

At the meeting held May 28, 1986, Complainant did not attend; however, Mack Brown (Brown) was present at the meeting as the representative of the Complainant. Economy borough council reviewed the bid presented by Complainant and directed numerous questions to Brown, which Brown responded to.[5] Brown also offered a certified check in the amount of $2,500.00 which he had received from Complainant as compliance with the performance bond requirement, which council rejected. Thereafter, by motion, borough council awarded the garbage and refuse disposal contract to Complainant "contingent on the receipt of the necessary performance bond, liability insurance and workers' compensation coverage to be presented prior to the next regularly scheduled

---

1. Complainant had a registered fictitious name of L & M Sanitation Co.

2. The advertisement was published April 25, May 1, and May 6, 1986.

3. The "bid" actually consisted of three "bids" with differing options for residential customers. The three service options for refuse disposal would cost 1) $3.75 a home for two (2) 32 gallon bags or containers plus one large item per week, costing each property owner 4 payments of $11.25 each per year, 2) $4.50 a home for four (4) 32 gallon bags or containers plus one large item per week, costing each property owner $13.50 each per year, and 3) $6.75 for an unlimited number of bags or containers, costing each property owner 4 payments of $20.25 each per year. The bids stated that the total yearly cost based upon servicing of 2500 homes for each of

the options came to $112,500.00, $135,000.00 and $202,500.00, respectively.

4. Powell, the then contractor for refuse collection, was white, and had provided service by agreement from 1981 through 1983 and thereafter as a result of bidding.

5. The minutes of that meeting reveal Brown was specifically asked by council about past experience, worker's compensation, the performance bond, billing of customers, and dumpsters. See Joint Exhibit 5. When questioned by council at the meeting about the performance bond, liability insurance coverage and workers' compensation coverage, Brown "assure[d] council, if the contract is awarded to him he will have the necessary bond and insurance." Brown further indicated "[i]f we get the contract we will hire employees and get the bonds and insurance."

Council meeting on June 10, 1986.... If necessary bonds and insurance are not presented the proposal will revert back to the present collector, E. Reid Powell, Refuse." See Joint Exhibit 5.

At the next council meeting on June 10, 1986, Complainant appeared, accompanied by Brown. Brown was asked what he had to present to council in the way of fulfilling the requirements. Brown stated that the bank would "not do anything without the contract actually being presented to them". Council indicated they would not present the contract to Complainant without the proof of bond and insurance. The solicitor explained that a letter from the bank saying that the money was put aside for the required surety bond of $25,000.00 was all that was necessary and that Brown should have contacted the solicitor for a copy of the minutes of the council meeting in which the contract was awarded subject to the contingencies of the bond and insurance. See Joint Exhibit 6.

Brown was then specifically asked if during their last conversation it was not clear to him exactly what was necessary. Brown replied "it was clear, he understood." After this discussion, the borough council determined that the requisite requirements for awarding of the contract to Complainant had not been met as Complainant had not obtained a performance bond [6] or other "security acceptable to council". Powell was then designated garbage collector for the borough consistent with the minutes of the May 28, 1986 meeting. See Joint Exhibit 6.

Thereafter, on August 6, 1986, Complainant filed a complaint of unlawful racial discrimination with the PHRC. After hearing, the PHRC issued a final determination on September 29, 1994, in which it found that Economy's award of the refuse and garbage contract to Powell constituted unlawful racial discrimination which necessitated remedial relief. The PHRC specifically found that the requirement for a performance bond was a pretext for discrimination because Powell, the prior hauler who was white, was not

required to provide such a bond on past contracts.

In its final order of September 29, 1994, the PHRC specifically directed that Economy cease and desist from discriminating in the award of its contracts, award Complainant the residential refuse and garbage pick-up contract for the year 1995–1996, pay monetary damages in the amount of $90,938.10 plus interest through the date of the public hearing, and report on its compliance with the Order within thirty (30) days. Economy's petition for review to this court followed.

■ Economy presents two issues for our consideration, i.e. whether substantial evidence exists to support the determination of the PHRC that it unlawfully racially discriminated in its award of the refuse and garbage pick-up contract, and whether the PHRC's award of monetary relief and award of the garbage and refuse contract to Complainant for the year 1995–1996 was within its authority. Our review of these issues is limited to whether the determination of the PHRC is in accordance with the law, whether the necessary findings of fact are supported by substantial evidence, and whether there has been a violation of constitutional rights. *Pittsburgh, Department of Personnel and Civil Service Commission v. Pennsylvania Human Relations Commission,* 157 Pa.Commonwealth Ct. 564, 630 A.2d 919 (1993). Our appellate review must focus on whether there is rational support in the record, when viewed as a whole, to support the PHRC's action. *Republic Steel Corp. v. Workmen's Compensation Appeal Board,* 492 Pa. 1, 421 A.2d 1060 (1980).

■ As to the issue of whether substantial evidence exists to support the determination by the PHRC of unlawful racial discrimination, we initially note that substantial evidence is defined as such relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Brown Transport Corp. v. Pennsylvania Human Relations Commission,* 133 Pa.Common-

---

**6.** A "performance bond" is defined as a surety bond which guarantees that a contractor will fully perform the contract and which guarantees against breach of that contract. Proceeds of the performance bond are used to complete the contract or compensate for loss in the event of nonperformance. See Black's Law Dictionary 1138 (6th ed. 1990).

wealth Ct. 545, 578 A.2d 555 (1990); *Consumers Motor Mart v. Pennsylvania Human Relations Commission,* 108 Pa.Commonwealth Ct. 59, 529 A.2d 571 (1987). Thus, herein, there must be substantial evidence presented sufficient to convince a reasonable mind, to a fair degree of certainty, that Economy violated the Pennsylvania Human Relations Act (Act), Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–962.2. *Thomas v. Pennsylvania Human Relations Commission,* 106 Pa.Commonwealth Ct. 598, 527 A.2d 602 (1987). With this standard in mind, our review of the record reveals substantial evidence does not exist to support the determination of the PHRC.

■ In a disparate treatment case, Complainant bears the burden of establishing a *prima facie* case of discrimination [7]; if he does so, the burden then shifts to employer to rebut the inference of discrimination by establishing some legitimate common, non-discriminatory reasons for its conduct or action. If the employer does so, in order to prevail, Complainant must then show by a preponderance of the evidence that the proffered reasons were pretextual and that Complainant was the victim of intentional discrimination. *Pittsburgh Board of Public Education v. Pennsylvania Human Relations Commission,* 128 Pa.Commonwealth Ct. 324, 563 A.2d 581 (1989); *Pennsylvania State Police v. Pennsylvania Human Relations Commission,* 116 Pa.Commonwealth Ct. 89, 542 A.2d 595 (1988).

■ The standards enunciated above are generally applicable to cases of alleged discrimination in the course of employer-employee relationships including *inter alia,* dis-

charge and refusal to hire. Our independent research has not revealed, either in the Act itself or any prior appellate decision of this Commonwealth, any particulars applicable to discrimination alleged in the context of prohibited conduct by government bodies when in the course of entering contractual relationships with independent contractors for the performance of municipal services.[8]

In *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* the Supreme Court of this Commonwealth examined this court's and the PHRC's method of following and applying the analytical model developed by the United States Supreme Court for Title VII cases (Civil Rights Act of 1964, including 42 U.S.C. § 1981) in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[9] The Supreme Court determined in *Allegheny Housing* that once a *prima facie* case of discrimination is established by the Complainant, the defendant must be heard in response and is to produce evidence of a 'legitimate, non-discriminatory reason' for the alleged wrongdoing. Once such evidence is presented by the parties:

the question for the Commission is whether, on *all* the evidence produced, the plaintiff has persuaded it by a preponderance of the evidence that the employer intentionally discriminated....

(Emphasis in original).

So it is with this case. Here, the Complainant demonstrated a *prima facie* case of discrimination which then shifted the burden to Economy to establish a legitimate, non-discriminatory reason for its action of not awarding the contract to Complainant. The PHRC found that Economy did establish

---

7. A complainant alleging disparate treatment must first make out a *prima facie* case of race discrimination by establishing that the complainant belongs to a protected minority (in this case black), that he or she applied for the position and was in fact bona fide, and that a non-covered individual was selected to fill the position. *Fairfield Township Volunteer Fire Company No. 1 v. Pennsylvania Human Relations Commission,* 530 Pa. 441, 609 A.2d 804 (1992); *Allegheny Housing Rehabilitation Corp. v. Pennsylvania Human Relations Commission,* 516 Pa. 124, 532 A.2d 315 (1987); *Winn v. Trans World Airlines, Inc.,* 506 Pa. 138, 484 A.2d 392 (1984). The Supreme Court has indicated that this standard is adapta-

ble to accommodate both the differences in the nature of the discrimination alleged, sex, race, etc., and the improper conduct alleged, discharge, refusal to hire, etc. See *Fairfield Township* and *Allegheny Housing.*

8. The Act does, however, recognize an "independent contractor". See Section 955(b).

9. The model enunciated in *McDonnell* was first approved by our Supreme Court for employment discrimination cases in *General Electric Corp. v. Pennsylvania Human Relations Commission,* 469 Pa. 292, 365 A.2d 649 (1976).

such a reason, and specifically stated as follows.

The Respondent has clearly asserted that the reason that the Complainant was not awarded the contract was because he could not obtain a performance bond which was a contingency of the bid.

With the above assertion, the Respondent has met its burden of production by simply producing evidence of a legitimate, nondiscriminatory reason for its action. Once the respondent has met its burden, the Complainant may prevail be [sic] showing that the proffered explanations are pretextual, or unworthy of credence. The Complainant still has the ultimate burden of demonstrating by a preponderance of the evidence that he is the victim of intentional discrimination.

The PHRC correctly stated the law relating to the initial burden of proof upon Complainant, shifting of the burden to respondent, which if met, then shifts the burden back to Complainant to demonstrate by a preponderance of the evidence that he was a victim of intentional discrimination. The PHRC further elaborated by finding:

Upon review of the evidence before the Commission, it is clear that at the May 28, 1986 meeting of the Respondent borough, the Complainant's representative was informed that L & M Sanitation [Complainant's company] was awarded the contract contingent on the Complainant's obtaining a performance bond. Stated quite succinctly, the issue in this matter is whether the Complainant can show that the Respondent's stated reason (inability to obtain a performance bond) is unworthy of credence.

See PHRC opinion at pp. 15–16.

The legitimate, nondiscriminatory reason established by Economy for its action of not awarding the contract to Complainant was Complainant's failure to obtain a performance bond or other security acceptable to council. Economy's presentation of the reason for its conduct then shifted the burden back to Complainant to establish that the reason set forth by Economy was pretextual or unworthy of credence. In support of his burden of proof, Complainant asserts several instances of disparate treatment.

■ Complainant specifically argues disparate treatment because 1) he was held to the requirement of a performance bond while on several previous occasions, Powell had been permitted to perform garbage and refuse pick-up without having a performance bond; 2) he offered a check to council in the amount of $2500.00 for ten percent (10%) of the performance bond which was not accepted; 3) he sought the assistance of the borough solicitor, Robert Lewis (Lewis), to obtain a performance bond which was not forthcoming; and 4) he offered property in lieu of the performance bond requirement which was not accepted by council. However, the evidence of record reveals that no discrimination was established by Complainant.[10]

As to the asserted disparity between the performance bond requirement for Complainant and Powell, the record establishes that a performance bond was not a condition for award of a contract prior to 1984 and that Economy's only condition was property liens to secure performance of the refuse contract.

10. In reviewing the testimony of record, we only look at the evidence up to the final award of the contract by Economy. In *University of Pittsburgh v. Pittsburgh Commission on Human Relations*, 124 Pa.Commonwealth Ct. 379, 556 A.2d 486 (1989), this court determined that only events occurring prior to or at the time of the alleged act of discrimination are relevant in determining whether the defendant/employer committed discriminatory acts. *University of Pittsburgh* relied upon the reasoning of federal courts in the cases of *United States v. Lee Way Motor Freight, Inc.*, 7 FEP Cases 710, 1973 WL 278 (W.D.Okla.1973); *United States v. Central Motor Lines, Inc.*, 338 F.Supp. 532, 556, 4 FEP Cases 216 (W.D.N.C.1971); *United States v. International Brotherhood of Electrical Workers, Local No. 38*, 428 F.2d 144, 151, 2 FEP Cases 716 (6th Cir.1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248, 2 FEP Cases 1121 (1970); *United States v. Chesapeake & Ohio Ry. Co.*, 471 F.2d 582, 5 FEP Cases 308 (4th Cir.1972), cert. denied, 411 U.S. 939, 93 S.Ct. 1893, 36 L.Ed.2d 401, 5 FEP Cases 862 (1973). We note that these cases reflect the prohibition of discrimination in contractual relationships involving industries affecting commerce as provided for in 42 U.S.C. § 2000e unlike 42 U.S.C. § 1981 cases which prohibits discrimination in the making and enforcement of private contracts.

It was not until 1984 that a "performance bond or other security acceptable to council" was required.[11] From 1981 through 1984, Powell provided property liens to secure the garbage and refuse pick-up contracts. R.R. at pp. 220a–227a. From 1984 through 1986, Powell provided a performance bond.

As to the offering of a check to borough council, the record indicates that Brown felt from past experience that an offer of ten percent (10%) of the performance bond amount was acceptable to accompany the bid of Complainant. Brown testified:

> They asked about the performance bond. I offered them a certified check for two thousand five hundred dollars. They asked what was the purpose for doing that. I said it was—Because we were trying to understand specifications of the performance bond, it was unknown, it was unclear as to how you wanted a performance bond. So we just offered it in good faith, two thousand five hundreds, ten percent of twenty-five thousand dollar performance bond that they were requiring.

R.R. at 130a–131a.

When questioned about how he arrived at the ten percent figure and whether he had any special expertise about performance bonds, Brown indicated:

> From past experience I recall in the bidding process, it was required sometimes to have ten percent of that performance bond at the time of bidding. Since it was unclear, I recommended to Mr. Moore that we do this.
>
> .    .    .    .    .
>
> It's hands-on experience.

R.R. at 131a.

As to assistance from Solicitor Lewis, Complainant testified that he tried to secure a performance bond between May 29, 1986, the day after the May 28, 1986 borough meeting, and the next June 10, 1986 meeting from his bank and from several insurance companies. However, Complainant also testified that he first contacted Lewis on June 3, 1986 regarding the performance bond, last contacted Lewis on June 6, 1986, and did not "expect Mr. Lewis to do anything for the bond." Complainant knew Lewis was the Solicitor for Economy and was not representing him. Complainant also testified that he did not retain either an attorney or an accountant. R.R. at 70a–77a.

Complainant also testified that sometime around June 6, 1986 he contacted his parents and Solicitor Lewis about using his parents property to cover the cost of the performance bond. R.R. at 72a. However, Complainant admitted that he did not present a copy of the deed, nor a copy of a recent tax assessment, nor an appraisal for the property, R.R. at 72a–73a, nor a lien search of the property. Complainant, at no time, tendered to council a note on or before June 10, 1986 in any amount signed by his parents as security for the performance of the refuse contract.

The record is clear and uncontradicted that the Specifications required a performance bond and any security in lieu of a performance bond must be "acceptable to council". The offer of a certified check in the amount of $2,500.00 as well as the mere statement that Complainant could use his parents' property was not acceptable to council. It was incumbent upon Complainant to comply with the Specifications and obtain a performance bond or other security acceptable to council prior to June 10, 1986; his failure to do so was not the result of disparate treatment by the Borough.

Though this particular case involves an allegation of discrimination in the course of bidding on a specified contract for municipal services, the standard for establishing said discrimination is similar to employment discrimination situations. Consistent with the foregoing, Complainant had the burden to establish by a preponderance of the evidence that Economy intentionally discriminated against him in the award of the refuse and garbage pick-up contract. Our review of the record as a whole fails to demonstrate substantial evidence to support any finding of intentional discrimination by Economy.

11. Although most of the testimony was directed to the "performance bond" provision in the Specifications, it is clear that the entirety of the Specifications controls. Specifically stated therein is the "performance bond or other security acceptable to council" provision.

Accordingly, as Complainant has failed to establish his ultimate burden of proof, we reverse the order of the PHRC.[12]

### ORDER

AND NOW, this 1st day of June, 1995, the order of the Pennsylvania Human Relations Commission is reversed.

---

**12.** Our determination that substantial evidence does not exist to support the determination of discrimination by the PHRC moots any consideration of the award of the contract or the damages issue.