Angeline **OSTAPOWICZ**

v.

**JOHNSON BRONZE COMPANY.**

Civ. A. No. 71–404.

United States District Court,
W. D. Pennsylvania.

Dec. 28, 1973.

See also D.C., 54 F.R.D. 465.

524

Robert Hackett, Pittsburgh, Pa., for plaintiff.

Jonathan L. Alder, Pittsburgh, Pa., for defendant.

## OPINION

KNOX, District Judge.

This is a class action case brought on behalf of plaintiff and other members of a class alleging that sex discrimination exists in the plant of Johnson Bronze Company, defendant, at New Castle, Pennsylvania. It is another of the cases described by Judge Dumbauld of this court in Bradford v. Peoples Natural Gas Company (W.D.Pa.1973), 60 F.R.D. 432, as resulting from the efforts of the "suave and subtle Southerners in Congress who put sex into the Civil Rights Act of 1964" when a giant step was taken towards "women's lib". The Section

of the Act with which we are concerned is Section 703(a)(1) which reads:

"It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, *sex* or national origin." (42 U.S.C.A. § 2000e–2(a)(1).

This action was brought on April 28, 1971, based upon a previous finding of reasonable cause entered July 10, 1970, by the Equal Employment Opportunities Commission (EEOC) YCL9–079 in which a thirty-day letter authorizing suit was issued March 29, 1971, which suit was thereafter duly commenced within the thirty days on April 28, 1971. On May 14, 1971, the complaint was amended to include two other thirty-day letters dated May 11, 1971, Nos. TCL–10558 and TCL–10802, Exhibits B and C attached to the Amendment to the Complaint, respectively.

After two days of hearings, the court concluded not to issue a preliminary injunction which had been sought, because no irreparable harm had been shown, although the court did determine tentatively that a prima facie case of sex discrimination had been made out. The evidence taken on the preliminary injunction is before us now under Rule 65(a). Despite protests by the defendant, the case was permitted to proceed as a class action and notices were duly sent to members of the class, certain of whom decided to opt out. Despite further attacks by the defendant, the court refused to deny the case the right to proceed as a class action.

After four more days of hearings, the case is now before the court for decision on the merits with respect to the issue of liability only. The issue of damages was deferred. The complexity of the issues in this bitterly fought litigation is shown by the fact that defendant's brief contains 99 pages plus appendices and the parties have together requested 226 findings of fact. Most of these are unnecessary, being directed at minutiae of details of evidence of individual witnesses. We proceed to make what the court regards as the essential findings as follows:

## FINDINGS OF FACT

(A) *Procedural and Jurisdictional*

1. Defendant Johnson Bronze Company is a Pennsylvania business corporation with its principal offices and only production plant which it owns and operates in New Castle, Lawrence County, Pennsylvania.

2. The plaintiff and other members of the class are individuals and residents of the Western District of Pennsylvania.

3. A charge was filed with the EEOC by Local 69, United Automobile, Aerospace and Agricultural Implement Workers of America (the union) on April 18, 1968, at Case No. YCL9–079 (hereinafter "YCL charges"). The union represented approximately 750 of the defendant's production and maintenance employees. The charge alleged that the defendant was maintaining job classifications segregated on the basis of sex, which segregation resulted in unequal lay-off and recall rights by female employees within the *bargaining unit* (our emphasis). Specifically, the charges related to the jobs of heavy packer in the shipping department, division 4 of the defendant's New Castle plant. The EEOC investigated this charge, and issued a decision on July 10, 1970, finding probable cause to believe the charge (Plaintiff's Exhibits A, UU).

4. On March 29, 1971, the EEOC mailed to all members of the union interested in the charge, a letter stating that conciliation had failed at Case No. YCL9–079, and that all members of the class were entitled to sue in federal district court within 30 days of the receipt of the letter.

5. The plaintiff, Angeline Ostapowicz, on behalf of the class, instituted this

suit on April 28, 1971, within the thirty days after receipt of the EEOC "right to sue" letter. The complaint as originally filed included as an exhibit to the complaint the "right to sue" letter, wherein Angeline R. Ostapowicz was named as a member of the class (Plaintiff's Exhibit UU).

6. The amended complaint in this action also alleges two further charges: TCL1–0558 and TCL1–0802 (Appendices 2 and 3). On May 10, 1971, the EEOC issued thirty-day "right to sue" letters on these two additional charges and on May 14, 1971, the plaintiff amended her complaint to include these additional charges referred to as the 1970 charges, filed October 16, and 27, respectively.

7. On March 10, 1972, the court determined that this action should proceed as a class action.

8. By order of March 10, 1972, the description of the class was revised to read as follows: "All past, present and future female employees of defendant Johnson Bronze Company at its New Castle, Pennsylvania, plant including all females who may in the past have sought and been denied employment because of sex discriminatory practices, with subclasses as follows: (a) all present female employees; (b) all past female employees; (c) all future female employees; (d) all females who have sought and been denied employment because of sex discriminatory practices."

(B) *On the Merits*

9. The defendant's plant operates in divisions as follows: (See Stipulation of Facts attached as Appendix A to Pretrial Stipulation.)

(1) Machine Shop

(2) Strip Manufacturing Department

(3) Foundry, Cleaning Room and Core Room

(4) Packaging and Shipping

(5) Maintenance

(6) Tool Room

(7) Safety and Sanitation

(8) Inspection

(9) Timekeepers and Expediters

(10) Pattern Shop

10. Mrs. Angeline R. Ostapowicz was one of the class of complainants in EEOC Case No. YCL9–079, having received a "right to sue" letter as a member of the class from the EEOC dated March 29, 1971.

11. As determined by the McBee personnel cards (Stip. Ex. 56) supplied by the defendant and the seniority list from the years 1960 to 1972 (Stip. Ex. 57), there have never been any females employed in the following divisions: (1) Foundry Division; (2) Tool Room Division; (3) Division 2 or Plant 2; (4) Maintenance Division and (5) Pattern Shop Division.

12. No woman ever operated as a department trucker in Division 1.

13. Lawrence Chiarini, seniority date May 27, 1952, was made a mail clerk in 1970 when many women senior to him were laid off; no female was ever made a mail clerk after 1960.

14. Rose Fortuna, hired October 25, 1948, and seven other women senior to Lawrence Chiarini, would not have had their employment terminated in 1972 if they would have been called back as mail clerks (Pltf's Ex. AA, Stip. Ex. 57).

15. In the year 1965, the defendant hired thirteen men in Division 1 and no females.

16. In 1966, the defendant hired 52 men in Division 1 and one female.

17. The only female hired in 1966 in Division 1 was Rose Curry, who was a relative of the former chief electrician of the defendant, Alex Pazsint. During the years 1963–1966, William Wise, personnel manager of the defendant, could recall hiring only one woman (Rose Curry) in Division 1.

18. During the years 1966 to 1972, the total employment of the defendant varied from 1,100 employees to 604 employees. There were extensive decreases in the number of employees during these

years as the result of decline in business.

19. Of the total work force of employees slightly less than 50% are employed in Division 1.

20. According to the EEO–1 Reports filed by the defendant in 1966, there were 147 female semi-skilled operatives (Pltf's Ex. WW); in 1967, there were 150 female semi-skilled operatives (Pltf's Ex. VV); in 1968, there were 119 female semi-skilled operatives (Pltf's Ex. XX); in 1969, there were 51 female semi-skilled operatives (Pltf's Ex. YY); in 1970, there were 53 female semi-skilled operatives (Pltf's Ex. ZZ); in 1971, there were 46 female semi-skilled operatives (Pltf's Ex. AAA); in 1972, there were 73 female semi-skilled operatives (Pltf's Ex. BBB).

21. In Division 1, there are four departments: aluminum, strip bushing, thin wall bearing and brass shops and in the four departments in Division 1, there are 320 machine centers. (Stip. Facts # 19)

22. In the machine operations of the defendant in Division 1, there are two separate classifications of machine operators: first class and second class. (Stip. Facts No. 21)

23. In the years from 1960 until the end of 1972, there have been only two female employees who have been made first class machine operators in Division 1 and on only two classifications of machines. They were Norma Ferrante and Theresa Trivilino.

24. A second class operator makes approximately ten cents per hour less than a first class operator under the wage scale.

25. Strength is not a determinative factor in becoming a first class operator and females are physically capable of making set-ups.

26. The manufacturing by the machines in Division 1 must meet precise specifications with very close tolerances.

27. The defendant's witness, William Wise, personnel manager, stated that to become first class, one must learn by tear-downs, watching machine setters, asking questions and attempting to make set-ups.

28. It is not possible to qualify for first class without experience, and you get the ability to be first class on machines only where you were second class. If you know how to set-up one type of machine in one machine center, this does not mean that you know how to set-up another machine in another machine center.

29. An employee who bumps [1] another employee on a machine has to be able to operate the machine and qualify as a first class operator immediately upon making the bump.

30. The defendant has no formal training program to help second class operators in the first division become first class operators.

31. Male machine operators were promoted to first class with no training and much less experience than females. Women were sent to the restroom and hence could not watch setters setting up their machines. The foreman of the defendant did not allow women to wait and watch machine setters set up the machines. This prevented women from acquiring the necessary skills.

32. In an average month, there are approximately 1,600 set-ups made by first class operators and 1,450 made by machine setters.

33. First class operators spend about 1,900 hours on set-ups and the machine setters spend about 2,000 hours on set-ups.

34. Machine setters, in fact, do make difficult set-ups for first class machine operators and set-ups on long runs.

35. The management of the defendant, which determines whether or not a woman is promoted to first class, is all

1. "Bump—to oust, usually by virtue of seniority right." Webster's Seventh New Collegiate Dictionary.

made up of males; there are no women in the management.

36. As of May 25, 1971, there were 26 men junior to plaintiff Ostapowicz working while she was laid off. All 26 of the men were first class operators.

37. Many men who were junior to female employees were laid off after female employees had been laid off and were recalled while senior female employees were still in lay-off status (Pltf's Ex. L).

38. Some women who were second class and were going to be laid off in 1967 had the desire to become first class so that they would not be laid off. Other women indicated no desire for such advancement.

39. No women were ever promoted to machine setters, foremen or assistant foremen.

40. No females have ever been paid on a wage scale of over $2.32 per hour. (Pltf's Ex. M and P)

41. The highest male wage earner makes a base wage of $4.51, based upon the base wage rate of March 27, 1972. (Pltf's Ex. M and P)

42. A woman who desired to become first class was told by the personnel manager that she "couldn't get it even if" she bid and that she couldn't have it. Plaintiff Ostapowicz was told it was foolish to try to qualify on a certain machine despite four years experience.

43. No record was kept by defendant of applicants who were turned away, so that it cannot be determined how many were women.

44. A foreman in the shipping department stated he would "take every girl machine operator in the shipping department off and replace them with men" if a woman became a heavy packer.

45. Whether a person is promoted to a machine setter or an assistant foreman or foreman or to management is solely up to the discretion of management, as there are no contract provisions and no objective tests are given. The tests were all subjective.

46. Machine setters were taken exclusively from the ranks of the first class machine operators; *ipso facto*, if there are no first class machine operators that are women, there can be no machine setters that are women.

47. The application of the defendant company for employment contains a sex indication on it, indicating female or male sex (Pltf's Ex. I); and the sex indication of those employees hired before the Civil Rights Act of 1964 went into effect in July, 1965, has not been obliterated from their employment records, i. e., McBee personnel cards.

48. If female employees who were laid off had not previously bumped a certain job classification, they were automatically not recalled to that classification at any time in the future; therefore, this increased their lay-off time so that they were eventually terminated.

49. The court adopts and incorporates by reference the facts contained in paragraphs 5 through 38, both inclusive, of Pretrial Stipulation of Facts attached as Exhibit A to the Pretrial Stipulation.

## DISCUSSION

The discussion in this case falls naturally into two categories: (A) Procedural and Jurisdictional, and (B) The Merits of the Case.

### (A) Procedural and Jurisdictional Matters

#### (1) *Extent of Charges and Jurisdiction of the Court*

■ The defendant strenuously claims that the complaints of the plaintiff and the other members of the class are not properly before the court since charges were never properly filed before the Equal Employment Opportunities Commission, hereinafter referred to as EEOC. The facts are that on April 11, 1968, plaintiff's union, Local 69, International Union of United Automobile, Aerospace and Agricultural Implement

Workers of America, as charging party filed a charge before the EEOC claiming violation of the law from December 1, 1967 "and continuing". This was assigned Case No. YCL9–079 by the Commission. The charge was served June 20, 1968.

The Commission handed down a decision on this dated August 6, 1970, in which it was determined that reasonable cause existed to believe the charges are true. In the decision, it is stated: "Charging party, hereinafter called the Union, alleges that respondent is engaging in unlawful employment practices in violation of Title VII of the Civil Rights Act of 1964 by maintaining job classifications segregated on the basis of sex which segregation results in unequal layoff and recall rights for female employees within the bargaining unit". The Commission further found: "The alleged violations are of a continuing nature, and therefore the filing was within the jurisdictional time limits of Title VII."

The time limits referred to are those contained in 42 U.S.C.A. § 2000e–5(d) as contained in the original Act of July 7, 1964.[2] This time was extended to 180 days by the 1972 amendments.

On March 29, 1971, conciliation efforts having failed, the EEOC sent to plaintiff Angeline Ostapowicz a so-called thirty-day letter which is found as plaintiff's Exhibit UU and is also attached to the complaint in this case as Exhibit A. This letter in the heading refers to "Case No. YCL9–079 (member of class)". It advised that conciliation efforts having failed, she had the privilege within thirty days of receipt of the letter to institute a civil action in the appropriate federal district court. This action was instituted April 27, 1971, and hence was in time.

It is true that the bulk of the decision of the EEOC is concerned with exclusion of females from heavy packing positions in the shipping department because of sex, but it is also true that the charge as filed was a general charge of sex discrimination.

We are cautioned by the United States Supreme Court in Love v. Pullman Co., 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) that in cases of this type we should not require "the creation of an additional procedural technicality.

"Such technicalities are particularly inappropriate in a statutory scheme in which laymen, unassisted by trained lawyers, initiate the process." It has been further held that the fact that all acts complained of did not occur within ninety days prior to the filing of the charge does not prevent consideration of the charge if a pattern of discrimination is shown and it is alleged that these are continuing practices of discrimination. See Fekete v. United States Steel, 353 F.Supp. 1177 (W.D.Pa.1973–Judge Scalera); Hecht v. Co-Operative for American Relief, 351 F.Supp. 305 (S.D. N.Y.1972); Bartness v. Drewrys, 444 F.2d 1186 (7th Cir. 1971). In such case any member of the class may bring the action. Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968). We therefore hold that the charges as contained in YCL9–079 and in the complaint and covered by the evidence in this case are properly before this court. See also Sanchez v. Standard Brands, Inc., 431 F.2d 455 (5th Cir. 1970).

---

2. *"Time for filing charges after occurrence of unlawful practices or termination of State or local enforcement proceedings; filing of charges by Commission with State or local agency.*

(d) A charge under subsection (a) of this section shall be filed within ninety days after the alleged unlawful employment practice occurred, except that in the case of an unlawful employment practice with respect to which the person aggrieved has followed the procedure set out in subsection (b) of this section, such charge shall be filed by the person aggrieved within two hundred and ten days after the alleged unlawful employment practice occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency."

**530**

(2) *Effectiveness of Charges TCL1–0558 and 1–0802 included in the Amendment*

█ Defendant vigorously contends that the additional charges of discrimination contained in the above case before the EEOC are not properly before the court because the thirty-day letter giving right to sue was issued by the Commission in each case on May 11, 1971, and it is claimed that the charges were not filed in court until August 12, 1971, when they should have been brought within thirty days under 42 U.S.C.A. § 2000e–5(e).

It is true that the Commission issued its thirty-day letters on these additional charges on May 11, 1971. The record in the case, however, shows that an amendment to the complaint containing the additional thirty-day letters at the above numbers was filed May 14, 1971, well within the thirty-day period. It is true that on August 12, 1971, at the time of the second hearing on preliminary injunction, the court entered an order allowing the amendment to be filed. But this order appears to have been surplusage. The original complaint was filed April 28, 1971, and the Answer was not filed until May 28, 1971, and therefore plaintiff had a right to amend her complaint without leave of court under Rule 15(a) of the Federal Rules of Civil Procedure and include the additional charges on May 14, 1971. In view of the fact that the additional charges covered by the two additional thirty-day letters pertain to sex discrimination at this very plant, there appears to be no good reason to the court why such amendments should not be allowed rather than forcing plaintiff to file a separate action based thereon which would probably have been consolidated with this case. The plaintiff, Angeline Ostapowicz, had to file her complaint in court within thirty days of the first thirty-day letter issued March 29, 1971, which she did, filing a complaint in this court on April 28, 1971. At that time, she had no thirty-day letter covering TCL1–0558 and 0802. If she attempted to include these charges at that time, she would have obviously been met with a motion to strike by the defendant. She filed them promptly on May 14, 1971. Under McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (May 14, 1973) it has been determined that the only two requisites to court action are: (1) timely filing of charges and (2) receiving and acting upon the statutory notice of the right to sue. Defendant's complaints of the failure of the EEOC to attempt to conciliate are therefore without merit.

The original complaints filed with the Commission at cases 0558 and 0802 are in evidence in this case, Stipulation Exhibits 13 and 14, and are clearly broad enough to cover all matters covering sex discrimination which have been brought to this court's attention during the hearings in the suit. We therefore hold these matters are all properly before the court.

(3) *Failure to File Charges With the Pennsylvania Human Relations Commission*

[3] Early in the course of this litigation, defendant claimed that the court was without jurisdiction in the matter because the case had not first been taken to the Pennsylvania Human Relations Commission, which is charged with jurisdiction over sexual discrimination under 43 Purdon's Pa. Stats. § 955, Act July 9, 1969, P.L. 133. The facts concerning this are set forth in the Court's memorandum order of September 22, 1971. It appears that the charges here involved were first filed with the EEOC, which referred this charge to the Pennsylvania Commission on September 29, 1970, and plaintiff wrote the Pennsylvania Commission on October 6, 1970, offering to make any further information available to it. However, on October 15, 1970, the Pennsylvania Commission waived jurisdiction over the case, as they were doing with all cases at that time, and referred the matter back to the EEOC. We held that this was substantial compliance

with the requirements of the Act, 42 U.S.C. § 2000e–5(b).

This holding of the court is in accord with the later decision of the United States Supreme Court in Love v. Pullman Company, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972) holding that such procedure was sufficient compliance with the federal Act.

### (4) *Failure to Join the Union as an Indispensable Party*

Plaintiff in her 1970 complaints 0558 and 0802, did claim that the union contract operated to discriminate against women. Particular complaints are made with reference to Article XXI as to bumping rights (Stip. Ex 35, being the agreement between the defendant and Local Union No. 69, International Union of United Automobile, Aerospace and Agricultural Implement Workers of America of which plaintiff was a member). Local Union 69 was not named as a respondent in the proceedings before the EEOC and is not named as a defendant in this case. On the other hand, the defendant has made no motion at any time during the course of this litigation to require plaintiff to join the union as a party. Most of the cases upon which the defendant relies are cases revolving around the motion to require the union to be joined. In the present posture of the case, without a motion to require joinder of the union, we have a question as to whether the union is an indispensable party under Rule 19 of the Federal Rules of Civil Procedure.

■ We agree with the decision of Judge Weis, now Circuit Judge, of this court in Torockio v. Chamberlain Manufacturing Company, 51 F.R.D. 517 (W.D.Pa.1970), that the fact that the union was not joined in the proceedings before the EEOC does not prevent joinder under Rule 19. It is noted, however, that in Torockio, the court did not rule on the question as to whether the union should be joined as a necessary party but merely indicated that joinder might be desirable.

Considerable reliance is placed by the defendants also upon Window Glass Cutters League v. American St. Gobain Corp., 47 F.R.D. 255 (W.D.Pa.1969), aff'd 428 F.2d 353 (3d Cir. 1970). That case, however, involved claims of rival unions where a decree enforcing the alleged rights of one union would necessarily effect the rights of others. Defendant also relies upon Hodgson v. New Kensington School Board in this court, Civil Action No. 71–1199 (unreported), wherein Judge Teitelbaum held that in an action under the Equal Pay Act, 29 U.S.C. § 201, by certain employees, the union should be joined. Again, what was before the court was a motion to compel joinder, and the employees by enforcing their alleged rights to equal pay were bound to cause the restructuring of the contract between the union and the school district.

In the reverse situation, in United States v. Sheet Metal Workers International Association, 416 F.2d 123 at 132 (8th Cir. 1969), in a suit against the union, the court recognized that the employers with whom the locals had collective bargaining agreements were not parties to the suit but held that they assumed that an agreement would be made to comply with the court's decree; if not, a decree against the union would be sufficient, or a question of joinder of the employers could be left for a later time.

■ In the instant case, it is true that plaintiff claimed there was discrimination as the result of the provisions of the collective bargaining agreement. In examining these provisions in detail, however, it does appear to the court that the complaint is not so much over the language in the agreement as over the fact that, given the setting of sex discrimination in this plant, the provisions of the contract then operate to the disadvantage of women. If the sex discrimination is eliminated as the result of orders of this court, then it would appear that the provisions as to bumping rights and so forth will work themselves out without any revision of the contract

necessarily being involved. See also United States v. Bethlehem Steel Corporation, 312 F.Supp. 977 (W.D.N.Y.1970), aff'd as modified 446 F.2d 652 (2d Cir. 1971).

We adopt plaintiff's argument as set forth in page ten of her reply brief where she says:

"Factually, the plaintiffs are unable to determine if the contract itself is discriminatory, or if it is the defendant's policy of not promoting the second class operators to first class operators which has caused the problem. It would seem that the provision in the contract perpetuates past discrimination, but if the females are made first class operators, the whole question of the contract is moot."

We also note that Article 7 of the contract[3] gives the company broad management powers which would be sufficient to eliminate discrimination in the opinion of the court.

In summary, the court at this time is unable to see how the union would be affected by a decree requiring the employer to end sex discrimination, and therefore we hold that the union is not an indispensible party under Rule 19.

(5) *Election of Remedies as a Result of Arbitration Award.*

 It is noted that the right to sue letters name the plaintiff Ostapowicz as a member of the class and give her the right to sue. Defendant claims that she cannot bring this suit in court because at various times in the past she had submitted grievances growing out of her alleged discriminatory treatment to arbitration. The court finds that there is no merit in this contention and agrees with what was said about this in Hutch-

ings v. United States Industries, Inc., 428 F.2d 303 (5th Cir. 1970), at page 313:

"But the arbitrator's determination under the contract has no effect upon the court's *power* to adjudicate a violation of Title VII rights."

The court holds that the ultimate determination of Title VII rights is a matter for the court.

In Hackett v. McGuire Brothers, Inc., 445 F.2d 442 (3d Cir. 1971), the court held that election of remedies did not apply to Title VII discrimination proceedings and said:

"The national public policy reflected both in Title VII of the Civil Rights Act of 1964 and in Section 1981 may not be frustrated by the development of overly technical judicial doctrines of standing or election of remedies. If the plaintiff is sufficiently aggrieved so that he claims enough injury in fact to present a genuine case or controversy in the Article III sense, then he should have standing to sue in his own right and as a class representative."

See also Fekete v. United States Steel Corp., 424 F.2d 331 (3d Cir. 1970).

Having now discussed the procedural and jurisdictional arguments raised by the defendant, we will turn to the merits of the case.

(B) Merits.

(1) *General Considerations.*

The trail which the court must follow through the labyrinth of facts presented in this case has recently been plainly marked by the United States Supreme Court in McDonnell-Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.

---

3. "The right to hire; promote; discharge or discipline for cause; and to maintain discipline and efficiency of employees, is the sole responsibility of the Company except that Union members shall not be discriminated against as such. In addition, the products to be manufactured, the direction of person- nel, the methods, processes and means of manufacturing and the decision on matters affecting the conduct of the business of the Company, are solely and exclusively the responsibility of the Company, provided the above does not conflict with any other Article in this Contract."

Ed.2d 668 (1973). The court there said:

"The Act does not restrict a complainant's right to sue to those charges as to which the Commission has made findings of reasonable cause, and we will not engraft on the statute á requirement which may inhibit the review of claims of employment discrimination in the federal courts. The Commission itself does not consider the absence of a 'reasonable cause' determination as providing employer immunity from similar charges in a federal court, 29 CFR § 1601.30, and the courts of appeal have held that, in view of the large volume of complaints before the Commission and the nonadversary character of many of its proceedings, 'court actions under Title VII are de novo proceedings and . . . a Commission's 'no reasonable cause' finding does not bar a lawsuit in the case.' "

The court further quoted from Griggs v. Duke Power Co., 401 U.S. 424, 91 S. Ct. 849, 28 L.Ed.2d 158 (1971), as follows:

"Congress did not intend Title VII, however, to guarantee a job to every person regardless of qualifications. In short, the Act does not command that any person be hired simply because he was formerly the subject of discrimination, or because he is a member of a minority group. Discriminatory preference for any group, minority or majority, is precisely and only what Congress has proscribed. What is required by Congress is the removal of artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification."

The court further held that the complainant in a case such as this must carry the initial burden of establishing a prima facie case of discrimination[4]

which may be done by showing: (1) that she belongs to the protected group, (2) that she applied for and was qualified for a job for which the employer was seeking applicants, (3) that despite her qualifications she was rejected and (4) that the employer sought applications of other persons of equal qualifications.

The court then held that the burden thereupon shifts to the employer to articulate some legitimate non-discriminatory reason for respondent's rejection. The court went on further to hold that even if the employer articulates a facially legitimate non-discriminatory reason for rejection of the employee or proposed employee, it must further appear that the rejection was bona fide and that conduct of the employee was not used as a pretext for discrimination. It appears that the burden of showing pretextual rejection is upon the employee once a legitimate reason has been articulated. With respect to statistics, the court went on to say:

"Other evidence that may be relevant to any showing of pretextuality includes facts as to the petitioner's treatment of respondent during his prior term of employment, petitioner's reaction, if any, to respondent's legitimate civil rights activities, and petitioner's general policy and practice with respect to minority employment. On the latter point, statistics as to petitioner's employment policy and practice may be helpful to a determination of whether petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination against blacks."

The court further commented with respect to Griggs, supra, that:

"It dealt with standardized testing devices which, however neutral on their face, operated to exclude many blacks who were capable of performing effectively in the desired positions. Griggs was rightly concerned that

---

4. McDonnell-Douglas Corp. involved racial discrimination, but the same rules would apply to sex discrimination.

childhood deficiencies in the education and background of minority citizens, resulting from forces beyond their control, not be allowed to work a cumulative and invidious burden on such citizens for the remainder of their lives."

The latter quotation is particularly apt with respect to the claim of the plaintiff that the so-called tests for advancing women to machine operator first class were a sham in view of the fact that no training program was provided to train women for such advancement and that women were not allowed to look on and observe while complicated setups were being made but instead were told to go to the ladies' room, whereas men were allowed to stand around and observe by observation.

We have the further principle involved with respect to sex discrimination under Title VII that "equality of footing is established only if employees otherwise entitled to the position whether male or female are excluded only upon a showing of individual incapacity . . . . This alone accords with the Congressional purpose to eliminate subjective assumptions and traditional stereotyped conceptions regarding the physical ability of women to do particular work." Rosenfeld v. Southern Pacific Co., 444 F.2d 1219 (9th Cir. 1971).

Our Third Circuit has likewise recognized that statistics may give rise to an inference or prima facie case of discrimination. See Jurinko v. Edwin L. Wiegand Co., 477 F.2d 1038 (3d Cir. 1973). In that case, the court pointed out that the company had operated under an assumption that women were physically unable to perform each and every production job.[5] In the present case, the court asked the personnel director whether it was the company's position that women were physically unable to perform the tasks of setting up these machines when it appeared that the

amount of weight to be lifted was minimal. It was apparent this was not the explanation for having scarcely any women as first class machine operators in division one. The court then asked if it was the company's position that women, while physically capable of performing these operations, were nevertheless intellectually inferior and unable to master these operations, which would be a serious charge against approximately one-half the human race. The only explanation offered as to the substantial lack of women in these jobs was that women didn't want them which, of course, is disproved by the fact that this suit is brought.

(2) *Weight to be Given EEOC Findings.*

The parties have spent considerable time arguing about the effect of the EEOC findings.

It seems that the trial in the district court is de novo, McDonnell-Douglas Corp., supra; Cox v. Babcock & Wilcox Co., 451 F.2d 13 (4th Cir. 1972). It has been held that the EEOC findings may be admitted into evidence in the trial in the district court, although the report is in no sense binding, and it has been said that they should be given no more weight than any other testimony at trial. We agree with the reasoning of the Fifth Circuit in Smith v. Universal Services, Inc., 454 F.2d 154 (5th Cir. 1972), wherein it was said:

"Certainly, these are determinations that are to be made by the district court in a de novo proceeding. We think, however, that to ignore the manpower and resources expended on the EEOC investigation and the expertise acquired by its field investigators in the area of discriminatory employment practices would be wasteful and unnecessary."

It has been further held that the admission of the EEOC findings is a matter

---

5. The order in Jurinko, was vacated, 414 U. S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214, on October 23, 1973, and remanded "for further consideration in the light of McDonnell-Douglas Corp. v. Green," supra. With respect to the making out of a prima facie case, however, Jurinko appears to be in harmony with McDonnell-Douglas.

of discretion for the court. Heard v. Mueller Company, 464 F.2d 190 (6th Cir. 1972). It is also true that in Griggs v. Duke Power Co., supra, the United States Supreme Court indicated that administrative interpretation of the Act by the Commission is entitled to great deference. This, however, appeared to apply to the guidelines interpreting the Act (referred to hereafter) and not necessarily to the findings of fact in a specific case.

In the instant case, it makes very little difference. We only have distinct findings and conclusions with reference to the heavy packers in the shipping department, Division No. 4, and while we have pointed out there were general charges made before the Commission at that time, the discussion is entirely devoted to the heavy packing question.

 The defendant claims that discrimination in the shipping department has ceased since 1968, and therefore these findings should not be considered, since it is claimed that all discrimination has ended. We hold that the evidence does sustain that at various times there has been discrimination in the shipping, this evidence being entirely aside from the findings of the EEOC; and the fact it may have ceased does not militate against the court issuing injunctive relief as to the future because this is all one plant and there is no safeguard against such discrimination being renewed.

With respect to the other charges made in TCL1–0558 and 0802, the Commission made no specific findings with respect to discrimination charged in those complaints but instead merely issued thirty-day letters. We therefore have no findings by the Commission which are in evidence in this case.

In other words, we consider this a matter of little or no importance. We have admitted the findings by the EEOC into evidence in this case along with all the other evidence but are giving these findings very little if any weight in our ultimate determination.

(3) *Prima Facie Case of Discrimination.*

After the hearing on the application for preliminary injunction, the court made a tentative finding of sex discrimination, although the preliminary injunction was refused for lack of showing of irreparable harm.

Now that the testimony has been completed, it appears under the rules in McDonnell-Douglas, there has been a definite prima facie showing of discrimination. A reference to the findings of fact makes this amply clear. They show that there was discrimination in advancement of women from second class machine operator to first class machine operator in Division 1; there has been discrimination with respect to females becoming heavy packers, certain divisions have no female employees, the hiring in certain divisions has been heavily loaded in favor of males, women with seniority have been terminated while males with junior rating were kept on, and no females have ever been promoted to management positions.

Defendant apparently claims that the decrease in number of females has been due to attrition as the result of decrease in employment at the plant, but despite the attrition, the fact that females have been discharged at a greater rate would indicate sex discrimination in the discharges. While defendant claims that the discrimination which previously existed in the shipping department was ended in 1968, the record indicates that it was still existing in 1970. There has been no proof that the job of heavy packer must be filled by males by reason of bona fide job qualifications or business necessity as a result of a requirement to do heavy work. We have testimony to the contrary from Donna Sieminowski, who said (Tr–287): "In your estimation, will you say that it is very clear that females could always have done the heavy packer's jobs in the shipping department? Answer: I believe they could have without intimidation."

The evidence further shows that no females have ever been employed in the

foundry division, toolroom division, Division No. 2—(strip department), the maintenance division, nor has any female ever been employed as a department trucker in division 1, nor as a mail clerk since 1960. The evidence further shows that in division 1, in various years, a large number of men were hired and either none or one female. The one female hired in 1966 appears to have been a relative of a former chief electrician. The personnel manager indicated that in the years 1963–1966, he could recall hiring only one woman in this division. There are women working in division 1. There are on the average of fifty females employed therein, but only one woman was permitted to qualify as a first class operator. The first class positions were those where it was necessary for a woman to qualify to set up a machine, either immediately in case of a bump or within five days in case of bidding on an opening. The only inference to be derived from the fact that only one woman ever was accepted as a first class machine operator is that it is a result of sex discrimination.

It is true that it appears that there were tests given, and a foreman giving a test testified that the women could not qualify, but these were all subjective tests, no objective tests were ever given. The record further shows that no training program was ever provided so they could qualify. As a matter of fact, training appears to have been given by observation only and yet, when machines were being set up, women were told to go to the ladies' restroom instead of being permitted to stand and observe the setups.

 The court is very conscious that a company should not be mandated to employ unqualified people on machines and that it is not the purpose of the Act to force employment where there is a bona fide disqualification. See 42 U.S.C. § 2000e–5(g).

The evidence, however, showed that there was no particular amount of strength required in setting up the machines since the articles that had to be lifted weighed from one to twelve ounces and there is further testimony about actual hostility against women being expressed by the personnel director of the defendant's plant.

As further evidence of the fact that women were unnecessarily disqualified as first class machine operators is the fact that first class machine operators the men, did not always set up their own machines. As a matter of fact, approximately half of the setups, i.e., putting the machine in position to do the next job, were performed by machine setters instead of by the machine operator himself.

With respect to the layoffs as the result of decrease in the defendant's business, it appears there was further discrimination in that the women who were second class machine operators, but senior to first class machine operators, were laid off before the first class operators and if a woman had once turned down a chance to bump for a certain job, she would not be re-called if laid off because she had turned down this bump.

As previously pointed out, it further appears that no women were ever promoted to machine setters, foremen, or assistant foremen, and all the people in management who made the decisions were male.

Keeping minority members in menial jobs has been held to establish a violation of Title VII of the Civil Rights Act of 1964. Parham v. Southwestern Bell Telephone Company, 433 F.2d 421 (8th Cir. 1970). Again, in Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir. 1972), the court said:

"All we do today is recognize the promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foremen are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black per-

sons dependent directly on decisive recommendations from Whites can expect non-discriminatory action."

Classifying women into a separate division so as to establish separate seniority rights has been held a violation of the Act. Glus v. G. C. Murphy Company, 329 F.Supp., 563 (W.D.Pa.1971).

It is also claimed that the defendant has carried through on its personnel records notations of the sex of the individuals, thus enabling them to determine whether a person was male or female for the purpose of bumping, promotions, and so forth. Such listing has been held improper. Pittsburgh Press Company v. Pittsburgh Commission of Human Relations, 413 U.S. 376, 93 S.Ct. 2553, 37 L. Ed.2d 669 (1973).

■ It is true that the defendant is not necessarily responsible for actions of all its employees in expressing or actively carrying out feelings of hostility towards women, but the defendant is responsible for acts of supervisory personnel. Fekete v. United States Steel Corporation, supra.

(4) *Rebuttal of Prima Facie Case.*

■ Following the course marked for us by McDonnell-Douglas Corporation, supra, having determined that the statistics and other evidence in this case show a prima facie case of sex discrimination, the burden then shifts to the employer "to articulate some legitimate non-discriminatory reason for respondent's rejection". While defendant has produced a large amount of testimony indicating that certain women were happy in the plant and thought there was no discrimination and while various officials disclaimed any intention of sex discrimination, nevertheless, we weigh this

evidence in the light of the principle that actions speak more loudly than words. The court frankly in the light of all the testimony in the case does not believe the disclaimers of lack of intent to discriminate.

The defendant has attempted to justify its actions upon the grounds that there was a bona fide occupational qualification, that whatever discrimination appeared was a matter of business necessity, and further that females did not want these jobs and did not want to be advanced, for example, to machine operator first class.

It is true that certain females testified they did not want the responsibility which went with the job of machine operator first class even though this meant more money, and the same, of course, might be true of many men. In the view of the court, however, this appears to be a type of warrantless assumption based on generalizations or stereotyped characterizations of the sexes, illustrations of which are given in the guidelines adopted by the EEOC. See 29 CFR 751, part 1604.2.[6] As a matter of fact, this characterization sounds like labels: "Men's Jobs" and "Women's Jobs", which have been held improper. See Pittsburgh Press Company, supra. It is the opinion of the court that to justify failure to advance women because they did not want to be advanced is a type of stereotyped characterization which will not stand. The regulations specifically provide that "individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group".

As previously pointed out, however, a generalization such as this, that women

6. "The Commission will find that the following situations do not warrant the application of the bona fide occupational qualification exception:

(i) The refusal to hire a woman because of her sex based on assumptions the comparative employment characteristics of women in general. For example, the assumption that the turn-over rate among women is higher than among men.

(ii) The refusal to hire an individual based on stereotyped characterizations of the sexes. Such stereotypes include, for example, that men are less capable of assembling intricate equipment; that women are less capable of aggressive salesmanship. The principle of non-discrimination requires that individuals be considered on the basis of individual capacities and not on the basis of any characteristics generally attributed to the group."

do not want advancement, simply will not stand in the face of the numbers of women who did not opt out in this suit.[7] According to the Clerk of Court's records, six females in subclass A did not opt out, and in subclass B, nineteen did not opt out. This certainly indicates that the members of the class who are still involved in this suit at least have interest in being advanced and that the facile excuse that women were not interested in advancement simply will not stand against the facts.

As to the defense of bona fide occupational qualification, this is of no moment in this case since it has been conceded that the matter of weight lifting among machine operators is of no importance, since the weights to be lifted are minimal. Insofar as this may have been a factor in past discrimination among the heavy packers, the defendant appears to have conceded that women are able to perform these tasks because the defendant now claims that any discrimination in the shipping department has been ended. Certainly, there is no particular bona fide occupational qualification with respect to advancement of women to foremen, assistant foremen or machine setters.

As to business necessity, it would appear that defendant is attempting to argue that it is bound by the terms of its agreement with the union with respect to seniority, and therefore, it cannot give effect to the anti-sex discrimination regulations. This to the court appears no defense at all. It has been held that defenses based upon seniority systems set up with the union, which are sexually discriminatory, are no defense. See Glus v. G. C. Murphy Company, 329 F.Supp. 563 (W.D.Pa. 1971).

In United States v. Bethlehem Steel Corporation, 446 F.2d 652 (2d Cir. 1971), the court has this to say at page 662:

"We accept that definition, but in the context of this case the 'business necessity' doctrine must mean more than that transfer and seniority policies serve legitimate management functions. Otherwise, all but the most blatantly discriminatory plans would be excused even if they perpetuated the effects of past discrimination. Clearly such a result is not correct under Title VII. Jones v. Lee Way Motor Freight, Inc. 431 F.2d 245, 249 (10th Cir. 1970). Necessity connotes an irresistible demand. To be preserved, the seniority and transfer system must not only directly foster safety and efficiency of a plant, but also be essential to those goals. Local 189, United Papermakers v. United States, supra, 416 F.2d 980, at 989. If the legitimate ends of safety and efficiency can be served by a reasonably available alternative system with less discriminatory effects, then the present policies may not be continued."

It appears that the business necessity doctrine means that there must be an overriding legitimate business purpose making the practice necessary to the safe and efficient operation of the business. United States v. Chesapeake and Ohio Railway Company, 471 F.2d 582 (4th Cir. 1972). Under the guidelines, further illustrations are given of a bona fide occupational qualification, such as a need to have an actor or an actress in a certain role in the theatre. This is certainly not that type of position. There may also be extreme cases where a history of rapes during the night hours in dangerous locations indicate that females should not be exposed to these hazards, but nothing like that has been shown in this case.

We should further point out that it may be that defendant's expressed hostility to females attempting to qualify as first class machine operators and the results of subjective tests given by fore-

---

7. By order dated March 10, 1973, four subclasses were described: Subclass A—present female employees; Subclass B—past female employees; Subclass C—future female employees; and Subclass D—females who have been denied employment because of discriminatory practices.

men to females who attempted to qualify would naturally have a chilling and discouraging effect upon female applicants, who would naturally conclude that it was no use and would only get them into more trouble with management than the difference in pay would be worth. See for example, Lea v. Cone Mills Corporation, 301 F.Supp. 97, aff'd 438 F.2d 86 (4th Cir. 1971).

It is true that we should not attempt to put unqualified women on the job. We are not informed as to the details of the test given all workers, however, the record shows that numerous men qualified as machine workers first class, whereas only one woman was so qualified over a period of years. The court, of course, cannot go into the plant and administer these tests, and it may be that this will be a difficult matter to supervise. Regardless of the specific nature of these tests and the specific results as to attempts by individual applicants to qualify, it appears to the court that the results of sex discrimination which seem to permeate this organization are operating in this area, and the court will have to do the best it can to frame remedies to insure that future qualifications tests are objective and not based upon subjective matters coupled with sex hostility.

#### (5) *Intentional Discrimination.*

 Under the provisions of 42 U. S.C.A. § 2000e–5(g), the court must find that the respondent "has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint" in order to issue an injunction or order other affirmative action or reinstatement or hiring with or without back pay.

The court has no hesitation in finding that there has been intentional discrimination at defendant's plant. Entirely aside from the expressions of management indicating hostility to female employees, we have the general rule as laid down in Local 189, United Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969), that the word "intentional" in this Act means that the defendant intended to do what it did, not that there was necessarily a deliberate and intentional violation of the law. This reasoning has been followed by the Court of Appeals for this Circuit in Kober v. Westinghouse Electric Corporation, 480 F.2d 240 (3d Cir. 1973) affirming the decision of Judge Weber of this court in 325 F.Supp. 467 (W.D.Pa.1971). The Court of Appeals said: "intentional unfair employment practices are those engaged in deliberately and not accidentally. No willfulness on the part of the employer need be shown to establish a violation of Section 706(g)."

#### (6) *Relief to be Granted.*

There still remains to be determined by the court what, if any, relief should be granted in a situation of this kind. At the present time, we have heard only the testimony with respect to liability, and the question of back pay and other relief has been left for subsequent determination by the court. The court is given broad powers under Section 706(g) (42 U.S.C.A. § 2000e–5(g) quoted. In view of the finding of intentional discrimination, the remedies available are (1) injunction, (2) ordering affirmative action, (3) awards of back pay. It would appear that any affirmative action taken should at a minimum include a training program whereby women can secure adequate training to pass the tests for advancement, and steps must be taken to assure that these tests are objective tests and not subjective tests depending upon the whim and will of individual foremen and other supervisors. It may be that the question of back pay should be referred to a magistrate for hearing and recommendation. We will, therefore, assign the case for further argument with respect to the question of relief to be granted. See supplemental Pretrial Order dated October 24, 1972, postponing consideration of damages and so forth until after determination of liability.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the parties and the subject matter of this action under the provisions of the Civil Rights Act of 1964 as amended, Title VII, Section 706 (42 U.S.C.A. § 2000e–5).

2. This action has been properly brought by the plaintiff as a class action on behalf of the classes and subclasses described in this court's order of March 10, 1972.

3. The defendant is an employer within the meaning of Section 701 of said Act (42 U.S.C.A. § 2000e) and plaintiff is an employee of defendant.

4. Defendant has engaged in unlawful employment practices in violation of Section 703(a) of said Act (42 U.S.C.A. § 2000e–2(a) in discriminating against plaintiff and other members of the class because of sex.

5. This proceeding is properly before this court under Section 706 of said Act (42 U.S.C.A. § 2000e–5).

6. The defendant has intentionally engaged in and is intentionally engaging in the unlawful employment practices described in paragraph 4 of these conclusions of law.

7. The prima facie case of sex discrimination shown by plaintiff's evidence has not been rebutted by defendant's evidence.

8. Plaintiff is not barred from seeking relief in this proceeding by any grievance procedures, arbitration proceedings or complaints to the National Labor Relations Board.

9. The unlawful employment practices in which defendant has engaged have permeated the entire work force of defendant's plant.

10. Under the circumstances of this case, Local Union No. 69, International Union of United Automobile, Aerospace and Agricultural Implement Workers of America, the Collective Bargaining Agent at defendant's plant, is not an indispensable party under Rule 19 of the Federal Rules of Civil Procedure.

11. A decree should be entered in favor of the plaintiff and against the defendant for the causes of action declared upon in the complaint.

12. The question of appropriate relief to be granted in this case whether injunction, affirmative action, costs, fees and/or awards of back pay shall be determined after further hearing and argument which is hereby fixed for Thursday, January 10, 1974, at 3:30 p. m.